**In re the Matter of the WELFARE OF R.B. and B.B.**

**No. C2-84-929.**

Court of Appeals of Minnesota.

June 18, 1985.

Robert J. Levy, University of Minnesota Law School, Minneapolis, for appellant.

Thomas L. Johnson, Hennepin County Atty., Nancy McLean, Asst. County Atty., Minneapolis, for respondent Hennepin County Dept. of Community Services.

William R. Kennedy, Hennepin County Public Defender, David Knutson, Asst. Public Defender, Judith D. Vincent, Vincent & Borgeson, Minneapolis, for respondent Mother.

Heard, considered and decided by FOLEY, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

FORSBERG, Judge.

This appeal is from an order denying the father's motion for a new trial and for amended findings, as well as from a disposition order, following an adjudication of neglect. The children were found to be neglected with respect to their father due to a pattern of sexual abuse. We affirm.

## FACTS

B.B. and R.B. are the children of appellant father and respondent mother. B.B. was born on December 10, 1978, and R.B. on February 19, 1981, making them five and two years old, respectively, at the time of trial. The children left the family home with their mother on August 31, 1982, following a lengthy period of marital discord, and moved into a women's shelter in St. Paul. Shortly thereafter, B.B. began to make complaints of prior sexual abuse.

Shelter staff noted aggressive and destructive behavior by B.B. the first two weeks. One staff person testified to an incident of sexual acting-out by B.B. with her sister which was inappropriate for her age. The first alleged complaint of abuse occurred on September 20, when B.B. while asleep on her mother's lap complained, "they are biting my bottom," while brushing that area with her hand.

After a visit with her father on October 9, 1982, B.B. complained to her mother that "my bottom hurts." At bedtime, she complained that "penises hurt my bottom." She asked her mother if they could see Dr. Reed, a psychologist she had been seeing for her aggressive behavior, the following day.

On October 12, B.B. saw Dr. Reed alone, repeating that "penises hurt my bottom," and stating, "it happened in a dream." She then spontaneously added, "my father didn't do it." That evening, however, and several other times that week, she complained to her mother of abuse by her father.

Dr. Reed contacted Hennepin County Child Protection Services on October 12 after the appointment with B.B. On October 19th, the child was taken to Dr. Shaubach for a physical exam, but would not permit a vaginal examination, and no physical signs of abuse were noted. B.B.'s complaints of previous sexual abuse continued, including allegations of oral sex and sex with appellant's brother, Uncle Charlie. These complaints were made both to her mother and to a staff member at the shelter.

Unsupervised visitation was suspended, as to both children, following the October 9 visit, pursuant to a referee's order of October 29. B.B. had reported to her mother that her father also involved R.B. in the sexual "contact."

As required by the visitation order, appellant reported to a psychologist for a psychological examination, including a Minnesota Multiphasic Personality Inventory (MMPI) test. The children were separately evaluated by Dr. Reed (B.B.) and Dr. Scott (R.B.), who observed a visit between R.B. and her father. Both Dr. Reed and Dr. Scott testified that in their opinion the girls had been sexually abused over a period of time. The children were referred for therapy to Dr. Fredrickson, and renewed their complaints to her. Dr. Fredrickson testified at trial that despite denials of abuse, or recantations, made by B.B., which she termed a very frequent occurrence in such cases, the children did not fabricate the allegations of abuse and did not learn them through coaching by adults or exposure to movies or television.

A dependency and neglect petition was filed on March 11, 1983. Appellant had filed for a legal separation, his wife for a dissolution. The family court and juvenile matters were consolidated for trial. At a pretrial conference in April, 1983, the issue of continued suspension of visitation led to a discussion of the appointment of an independent psychologist, for the purpose of evaluating visitation. The court ordered that the children should be evaluated by a psychologist selected by the mutual agreement of all parties. Appellant's suggestion was vetoed by his wife's attorney, and a Dr. Susan DeVries was selected without appellant's concurrence, although he cooperated fully in being interviewed by her. Dr. DeVries testified to her opinion that children of that age do not fabricate stories of sexual abuse, and that B.B. had had sexual experience.

The appellant brought a motion to have the children examined by a psychologist whom he could call as his own expert. This motion was denied after a hearing, a month before the scheduled trial date. The motion was opposed as being a further intrusion upon the children, and a possibly traumatic experience for them, especially as appellant sought an evaluation based on observance of an interaction between himself and the children. Appellant did not obtain an expert witness to testify at trial.

There were a number of recantations of the accusations by B.B. Three denials were made to Dr. Fredrickson, including one in the presence of appellant's attorney. One denial was made to Dr. DeVries, and several to Dr. Reed. The children did not accuse any adults other than their father and their Uncle Charlie. Their mother noted an accusation by B.B. against two children at the shelter, but this was never investigated.

There was no testimony of physical evidence of sexual abuse. Although the children were taken for physical exams, the earliest was the October 19 exam with Dr. Shaubach, when B.B. refused a complete vaginal examination.

In order to assess the ability of B.B. to testify in court, the trial court conducted an examination in chambers. All parties submitted suggested questions, and an attempt was made to have the child questioned by counsel. Appellant's written questions were substantially completed when B.B. resisted further questioning by the court. The trial court determined she would be unable to testify at trial.

## ISSUES

1. Did the trial court abuse its discretion in denying appellant's request to have the children examined by a psychologist of his choice?

2. Was the finding of neglect arising out of sexual abuse by appellant supported by clear and convincing evidence?

## ANALYSIS

### 1. Adverse psychological examination

Appellant's position is that the trial court should have allowed him to have his own

expert evaluate the children, preferably during a session of interaction with him, to enable him to meet the expert testimony presented by the county. He suggests that a predisposition of the psychologists who testified to find evidence of sexual abuse, as well as their partial reliance on each other's reports, combined with the unexplained separation of the children from their father, entitled him to an independent evaluation free of these alleged flaws.

■ Rule 57.08, Minn.R.Juv.Ct. provides that the court may order a physical or mental examination of a participant in juvenile proceedings, including a child, "on motion for good cause shown." Such an order is within the trial court's discretion, and will not be reversed absent an abuse of discretion, which requires a showing of prejudice to the appellant. *Higgins v. Lufi*, 353 N.W.2d 150 (Minn.Ct.App.1984) (examination under Minn.R.Civ.P. 35.01); *Haynes v. Anderson*, 304 Minn. 185, 232 N.W.2d 196 (1975) (examination under Minn.R.Civ.P. 35.01).

■ Appellant contends that his request is not for an adverse examination but for an independent, interactive evaluation to have been ordered early in the case, when the children did not feel abandoned by their father. Besides the obvious impossibility of undoing the course of the proceeding, this argument ignores the fact that appellant himself did not make a motion for an evaluation by a psychologist of his choosing until September 28, 1983, less than two months before trial.

The question of selection of a court-appointed psychologist initially arose in April, 1983 when the guardian ad litem's proposed supervision of visitation with appellant was opposed on the grounds it required an expert psychologist. Appointment of such an expert was ordered, to be agreed upon by all parties. After appellant's choice was vetoed, Dr. DeVries was chosen and became the fourth psychologist to interview the children.

In *Higgins*, this court held there was no abuse of discretion in denying a *second*

adverse neurological examination where the physician was not scheduled as a witness and could not conduct the examination before the scheduled trial date. Here appellant requested a first adverse psychological exam, but one which would probably also have required a postponement of the trial, and which would have been the fifth psychological evaluation of B.B. We conclude that denial of this request, considering the likelihood of damage to the children, was within the trial court's discretion.

■ The alleged bias of the psychologists so far involved in the case does not suggest "good cause" for independent adverse examination.

The psychologists who evaluated the children did so with the mother's report as a background. It is not to be expected, however, that the children would be evaluated by someone with no knowledge of the suspected abuse, or the reasons for the referral. The use of leading questions to elicit stories of abuse from the children was largely limited to Dr. Fredrickson, who was specifically consulted for therapy rather than for an evaluation of the charges of abuse, and whose testimony was cumulative on that issue. The psychologists consulted for evaluation did not unduly lead the children to relate abuse.

■ Although the psychologists were not allowed to express an opinion as to whether appellant personally had abused the children, *see, State v. Saldana*, 324 N.W.2d 227, 231 (Minn.1982), they did state their opinions that the children did not fabricate the stories, and that some sexual abuse had occurred. The opinions as to credibility were proper since the alleged victims were children. *Saldana*, 324 N.W.2d at 231. The supreme court has held that it is within the trial court's discretion to admit qualified expert testimony describing the psychological and emotional characteristics observed in sexually abused children. *State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984). This testimony was properly admitted. Appellant concedes that the hearsay statements of the mother, shelter staff, and the psychologists relating com-

**358**

plaints of abuse were properly admitted. This court has held that a child's hearsay statements as to abuse may be admitted under the residual exception to the hearsay rule, Minn.R.Evid. 803(24), in a proceeding to restrict a parent's visitation rights. *M.N.D. v. B.M.D.*, 356 N.W.2d 813, 818 (Minn.Ct.App.1984) (child found to be competent but did not testify).

### 2. Evidentiary support

█ In a petition for dependency and neglect, the statutory grounds alleged must be proven by clear and convincing evidence. *Matter of Welfare of V.R.*, 355 N.W.2d 426, 431 (Minn.Ct.App.1984). If the findings are supported by substantial evidence and are not clearly erroneous, the trial court's decision must be affirmed. *Matter of Welfare of Clausen*, 289 N.W.2d 153, 156 (Minn.1980).

█ Appellant challenges the sufficiency of the evidence on a number of grounds. He claims that a pattern of escalation of the charges of abuse, as well as the recantations by the children, discredits them. A reviewing court, however, is not in a position to assess the credibility of witnesses. *See Strouth v. Wilkison*, 302 Minn. 297, 299, 224 N.W.2d 511, 513–14 (1974). A number of the psychologists testified that recantation by children of allegations of sexual abuse is a frequent occurrence which reflects on the enormity rather than the veracity of the charges. The weight of this testimony, as well as the weight, if any, to be given the recantations and the denials of abuse by appellant, was for the trial court to determine.

█ There was considerable evidence of a convincing nature to support the finding that appellant sexually abused his children. The sexual acting-out of B.B., the spontaneity of many of her complaints, including those immediately after the October 9 visit with appellant, and the consistency and detail of the complaints, made to many different people, as well as the unanimity of experienced psychologists, are compelling evidence. *Cf. Murray v. Antell*, 361

N.W.2d 466, 469–70 (Minn.Ct.App.1985) (child showed no "obvious indications of emotional stress," psychiatrist conducted only one interview five months after alleged abuse, and had limited experience in diagnosing abuse).

Appellant's claim that his wife coached the children to allege abuse to express her anger towards him does not explain the sexual acting-out which B.B. displayed. In *State v. Sullivan*, 360 N.W.2d 418 (Minn. Ct.App.1985), where manipulation of the child by a parent was also alleged, but the child "acted out" sexually, this court stated:

It is difficult to believe that a four-year-old would develop this disturbing behavior, which was observed by several impartial witnesses, simply to support a fabricated story.

*Id.* at 422.

█ Appellant also raises constitutional issues regarding the neglect proceeding, asserting a denial of the Sixth Amendment right to confrontation and of Fourteenth Amendment due process. Since these issues were not raised before the trial court in the motion for a new trial, and are raised for the first time here, we will not consider them on appeal. *Matter of Welfare of C.L.L.*, 310 N.W.2d 555, 557 (Minn.1981).

### DECISION

The trial court did not abuse its discretion in denying appellant's request to have the children examined by a psychologist of his choice. The finding of neglect arising out of a pattern of sexual abuse committed by appellant was supported by clear and convincing evidence.

Affirmed.