856 So.2d 6 (2003)
Darrell OLGES, Petitioner,
v.
Michelle DOUGHERTY and Brett Steven Trask, Respondents.
No. 1D02-5152.
District Court of Appeal of Florida, First District.
August 29, 2003.
Rehearing Denied October 13, 2003.
*8 Brian J. Lee, Esquire and Carl Scott Schuler, Esquire of the Law Offices of Carl Scott Schuler, P.A., Jacksonville, for Petitioner.
Kimberly M. Reid, Esquire and David R. Evelev, Esquire of Alvarez, Sambol, Winthrop & Madson, P.A., Orlando, for Respondents.
BENTON, J.
By petition for writ of certiorari, Darrell Olges, the plaintiff in an automobile accident case, asks us to quash a trial court's order (stayed pending review here), compelling him to "submit to an examination... including a psychological clinical interview and ... psychological testing." We grant the petition for writ of certiorari and quash the order.

I.
Mr. Olges brought suit seeking to recover damages for injuries allegedly sustained on March 28, 2001, when the car he was driving collided with Brett Steven Trask's car, which Michelle Dougherty was driving. The original complaint sought damages for "bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition." Later, faced with the prospect of a mental examination, he withdrew all claims for damages for future lost wage-earning capacity, past or future mental anguish, and past or future emotional distress or other emotional damages.
On October 9, 2002, Ms. Dougherty and Mr. Trask filed a motion seeking an order requiring Mr. Olges to submit to a "vocational rehabilitation evaluation" conducted by one Michael Shahnasarian, Ph.D., who is, among other things, a licensed psychologist, licensed mental health counselor, diplomate of the American Board of Psychological Specialties, certified rehabilitation counselor, and certified life care planner. Mr. Olges objected and moved for a protective order, arguing that a "vocational rehabilitation evaluation" was not warranted because he had withdrawn his claim for future lost wage-earning capacity. Anticipating that Dr. Shahnasarian would conduct psychological testing, the motion for protective order also argued that Mr. Olges "should not be required to submit to psychological evaluations or other similar procedures under the guise of a "vocational rehabilitation evaluation.'"

II.
At the hearing on the motions on November 7, 2002, the defendants below shifted their ground somewhat, seeking to compel Mr. Olges to submit to an evaluation by Dr. Shahnasarian principally in his capacity as a life care planner.[1] Dr. Shahnasarian *9 testified that in preparing Mr. Olges's life care plan he would take into account the spinal column stimulator prescribed by Christopher Roberts, M.D., Mr. Olges's treating physician and a pain management specialist.[2] But Dr. Shahnasarian also testified that he wanted to perform psychological testing. He told the trial judge that physicians who are pain management specialists typically "order a battery of psychological testing" before prescribing a spinal column stimulator, stating: "[I]t is standard practice among physicians to do some type of a testing, typically the MMPI,[3] which is a test that I would like to administer to Mr. Olges, prior to recommending [an] implant...."
In response to Dr. Shahnasarian's testimonyand defense counsel's argument that Dr. Shahnasarian should be allowed "to comment on" the use of an implanted device for managing Mr. Olges's painthe trial judge asked (then answered) a rhetorical question: "What can he possibly comment on whether or not that is an effective modality for the treatment of pain? He's not an MD." The trial judge denied the motion for protective order nevertheless, and directed Mr. Olges to submit to examination by Dr. Shahnasarian, for the stated reason that pain management treatment involves "a very heavy emphasis on the psychological aspect of the party."
The trial judge specifically ruled that the examination could consist of a "psychological clinical interview and any testing including an MMPI or other psychological testing referenced during the course of... testimony at the hearing...." When Mr. Olges indicated his intention to seek review by filing a petition for writ of certiorari, the trial judge stayed the order pending disposition of the petition. Before filing the petition, Mr. Olges again moved for a protective order, this time attaching to his motion an affidavit in which Dr. Roberts states that "there is no medical need or justification" for ordering "any psychological testing or evaluation." After the trial court denied his renewed motion, Mr. Olges filed the instant petition for writ of certiorari.

III.
We review the merits of a non-final order on petition for writ of certiorari *10 only where "[t]he order ... cause[s] material injury to the petitioner [that cannot be cured] throughout the remainder of the proceedings below, effectively leaving no adequate remedy on appeal." Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla.1987); Naghtin v. Jones, 680 So.2d 573, 577 (Fla. 1st DCA 1996). "[I]t is ... necessary for an appellate court to conduct a jurisdictional analysis prior to testing whether the nonfinal order ... is a `departure from the essential requirements of law.' Thus, ... a petitioner must [first] establish that an interlocutory order creates material harm irreparable by postjudgment appeal...." Parkway Bank v. Fort Myers Armature Works Inc., 658 So.2d 646, 649 (Fla. 2d DCA 1995). See also Jaye v. Royal Saxon, Inc., 720 So.2d 214, 215 (Fla.1998) ("[I]t is settled law that, as a condition precedent to invoking a district court's certiorari jurisdiction, the petitioning party must establish that it has suffered an irreparable harm that cannot be remedied on direct appeal.").
Interlocutory orders requiring mental examinations are held to cause harm of a kind that cannot be remedied on appeal from final judgment. "In the context of compelled [mental] examinations, the required element of irreparable harm may be found based on the notion that once the invasive harm of the examination occurs, it cannot be undone on appeal." Taylor v. Columbia/HCA Doctors Hosp. of Sarasota, 746 So.2d 1244, 1245 (Fla. 1st DCA 1999). See also Martin-Johnson, Inc., 509 So.2d at 1100 ("We recognize that discovery of certain types of information may reasonably cause material injury of an irreparable nature. Illustrative is `cat out of the bag' material that could be used by an unscrupulous litigant to injure another person or party outside the context of the litigation."); Vo v. Bui, 680 So.2d 601, 601 (Fla. 2d DCA 1996) (treating case as involving a petition for writ of certiorari because the alleged harm, a nonfinal order "requiring the wife to undergo a psychological evaluation .... will not be remediable on appeal" (citation omitted)); Gasparino v. Murphy, 352 So.2d 933, 935 (Fla. 2d DCA 1977) ("It goes without saying that petitioner could suffer irreparable injury by virtue of a compulsory psychiatric examination. Discovery of this type is of the most personal and private nature. The potentially negative effects of requiring petitioner to bare his inner self against his wishes are self-evident.").

IV.
Safely across the initial, jurisdictional threshold, Mr. Olges also has the burden to demonstrate that the trial court departed from the essential requirements of law in ruling as it did. See Martin-Johnson, Inc., 509 So.2d at 1099; St. Paul Fire & Marine Ins. Co. v. Marina Bay Resort Condo. Ass'n, Inc., 794 So.2d 755, 756 (Fla. 1st DCA 2001). Central to this aspect of the case is Florida Rule of Civil Procedure 1.360's ("Examination of Persons") requirement that any party requesting that another party be subjected to a mental examination be able to show good cause for ordering the examination.

A.
At the motion hearing below, it was incumbent upon the defendants (respondents here) to establish good cause, beginning with proof of the facts on which they relied as proponents of the examination. If good cause had been shown, it would have been within the authority of "the court [to] establish protective rules governing such examination." Fla. R. Civ. P. 1.360(a)(3). See also Fla. R. Civ. P. 1.280(c) ("Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in *11 which the action is pending may make any order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense that justice requires...."); Medina v. Yoder Auto Sales, Inc., 743 So.2d 621, 623 (Fla. 2d DCA 1999) ("The party moving for the protective order has the burden to show good cause."). But the question of protective rules or protective orders never arises and the burden never shifts unless the proponent of the examination shows good cause for an examination in the first place. See Fla. R. Civ. P. 1.360(a)(2) ("An examination under this rule is authorized only when the party submitting the request has good cause for the examination. At any hearing the party submitting the request shall have the burden of showing good cause.").

B.
By the time of the hearing, the complaint's prayer for "medical and nursing care and treatment," in conjunction with Mr. Olges's possible need for a spinal column stimulator (which, although not specifically pleaded, had already been the subject of discovery), was the only basis remaining for respondents' asserted entitlement to the mental examination. Respondents' counsel stated as much at oral argument. Any hope the defendants had of proving good cause for requiring Mr. Olges to undergo a mental examination rode on the testimony of their only witness at the hearing, Dr. Shahnasarian.
Defense counsel described Dr. Shahnasarian as a "life care expert," and he testified he was "licensed as a psychologist, licensed as a mental health counselor, certified as a rehabilitation counselor, [and] certified as a life care planner." As for good cause for ordering a mental examination, Dr. Shahnasarian testified that referral for a psychological examination was the "standard practice among physicians." But Dr. Shahnasarian's testimony was not competent on this point. He is not a physician, and he was not offered as an expert on standard medical practice.
Neither as a psychologist nor as the wearer of his many other hats was Dr. Shahnasarian shown to possess the "knowledge, skill, experience, training, or education" necessary to qualify as an expert on the standard of care required of a medical doctor who recommends that a spinal column stimulator be implanted. § 90.702, Fla. Stat. (2002). See Fabianke v. Weaver, 527 So.2d 1253, 1257 (Ala.1988) (noting, "Of course, the testimony of the psychologist was not offered to prove the standard of care required of a medical doctor," while not "find[ing] that the trial court abused its discretion in allowing [other] testimony of the psychologist"); Bell v. Hart, 516 So.2d 562, 570 (Ala.1987) (affirming determination in a medical malpractice action that a pharmacist and a psychologist were not qualified to "testify whether a medical doctor followed the proper standard of care in prescribing the drug Elavil. Neither was shown to be authorized to prescribe the drug. While their knowledge of the drug and its effect on the human body may or may not be greater than that of a medical doctor authorized by law to prescribe the drug, we cannot permit a nonphysician, who cannot legally prescribe a drug, to testify concerning the standard of care that should be exercised in the prescription of the drug."); Lundgren v. Eustermann, 370 N.W.2d 877, 880-81 (Minn.1985) (reversing determination in a medical malpractice action that a psychologist was qualified to give opinions on the standard of care required of a medical doctor because a psychologist lacks "practical experience or knowledge of what physicians do" and therefore "does not have *12 the practical knowledge and experience contemplated").[4]

V.
Not every automobile accident case gives rise to good cause to require the plaintiff to undergo a mental examination. See Byxbee v. Reyes, 850 So.2d 595 (Fla. 4th DCA 2003). Here, once Mr. Olges abandoned his original efforts to recover damages for mental anguish, emotional distress and other emotional damages, his mental condition ceased to be "in controversy" as contemplated by the rule. See Partner-Brown v. Bornstein, 734 So.2d 555, 556 (Fla. 5th DCA 1999). Dr. Shahnasarian's testimony did not establish otherwise. See Fla. R. Civ. P. 1.360(a)(1) ("A party may request any other party to submit to ... [a mental] examination ... when the condition that is the subject of the requested examination is in controversy."); Bjerke v. Nash Finch Co., 2000 WL 33339658, at *1 (D.N.D. Feb.1, 2000) (holding a mental examination unwarranted where plaintiff withdrew claims of intentional and negligent infliction of emotional distress in response to defendant's motion to compel a mental examination, yet still prayed for "compensatory damages, including mental anguish and humiliation," because "plaintiff's claim [w]as a `garden variety' claim of emotional distress that does not place her mental condition genuinely in controversy" and the plaintiff did "not intend to offer expert testimony"); Smith v. J.I. Case Corp., 163 F.R.D. 229, 230-31 (E.D.Pa.1995) (denying motion to compel mental examination where plaintiff withdrew separate claim for emotional distress yet retained claims for embarrassment and myofascial pain syndrome, where plaintiff had no expert to testify about embarrassment and did not allege that the embarrassment was severe or amounted to a psychotic disorder).
The petition for writ of certiorari is granted, and the order under review is quashed.
WOLF, C.J. and ERVIN, J., CONCUR.
NOTES
[1] Life care planners prepare comprehensive projections of future medical care and treatment needs to aid economists in calculating the present value of future medical care and treatment. In doing so, they necessarily rely on physicians' recommendations. See Diamond R. Fertilizer v. Davis, 567 So.2d 451, 455 (Fla. 1st DCA 1990) (finding that trial court erred in adopting a life care plan which gave the planner "discretion to oversee and supervise [a workers' compensation] claimant's medical and nursing care" because "[t]he responsibility for establishing a treatment plan rests with a claimant's authorized physicians.").

Counsel for Mr. Olges stated that he had no objection to the life care plan evaluation proposed at the hearing or to "Dr. Shahnasarian's examinations, if you will, ... excluding an examination for the purpose of determining psychological factors."
[2] A physician, such as a neurologist, neurosurgeon, orthopedic surgeon, psychiatrist, or anesthesiologist, "may obtain a certificate of `Added Qualification' in Pain Management from The American Board of Anesthesiology (recognized by the A.M.A. Board of Medical Specialities)." 1 Dan J. Tennenhouse, Att'ys Med. Deskbook § 6:13, at 6-86 (3d ed.1993). Pain management specialists "explore multiple dimensions of the control of chronic pain, from the psychiatric to the neurosurgical." Id.
[3] The MMPI, or Minnesota Multiphasic Personality Inventory, is a so-called personality inventory that consists of statements expressing a wide range of attitudes and fe[e]lings, and the subject is asked to indicate whether these are True, False, or whether he is unable to say, in regard to their applicability to himself.

....
... [S]uch questions are asked not for the purpose of obtaining factual information about the subject's experiences and beliefs, but rather to measure the subject's psychological traits.
Haynes v. Anderson, 304 Minn. 185, 232 N.W.2d 196, 199-200 (1975).
[4] Cf. Grenitz v. Tomlian, 858 So.2d 999, 1002-03, 2003 WL 21290887, at *3 (Fla. June 5, 2003) ("[A] neuropsychologist is competent to testify regarding the results of psychological testing reflecting the presence of organic impairment.... [However], the trial court ... did not err in disallowing the opinion testimony of someone other than a qualified physician as to the medical causation of ... brain damage." (citations and footnotes omitted)); Cross v. Lakeview Ctr., Inc., 529 So.2d 307, 310 (Fla. 1st DCA 1988) (explaining that the plaintiff in a medical malpractice action must establish a breach of the prevailing professional standard of care and that a psychologist does not "possess[] sufficient training, experience, and knowledge as a result of practice or teaching ... in a related field of medicine, so as to be able to provide such expert testimony as to" whether a psychiatrist deviated from the "psychiatric standard of care by not performing ... psychological tests").

Although a psychologist's testimony is not competent evidence of the standard of care required of a medical doctor, a physician may be qualified to testify as to the standard of care required of a psychologist. See generally Alford v. G. Pierce Woods Mem'l Hosp., 621 So.2d 1380, 1383 (Fla. 1st DCA 1993) (affirming trial court's denial of a request for chiropractic treatment since an orthopedic surgeon's testimony that "chiropractic manipulation [of the spine] would be inappropriate given the claimant's arthritic condition" sufficiently supported denial of the request); Van Sickle v. Allstate Ins. Co., 503 So.2d 1288, 1288 (Fla. 5th DCA 1987) (holding that an orthopedic physician is not "unqualified from also being sufficiently knowledgeable of chiropractic healing as to render an expert opinion on the reasonableness of chiropractic care and treatment in a particular case.").